IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**JOSE JULIO RODRIGUEZ-CUMBA**,<br><br>Defendant. | Criminal No. 21-359 (PAD/BJM) |

### REPORT AND RECOMMENDATION

The grand jury returned an indictment charging Jose Julio Rodriguez-Cumba ("Rodriguez-Cumba") with two counts of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Dkt. 3. It also charged him with one count of conspiracy to commit the same act in violation of 21 U.S.C. §§ 841(a)(1) and 846 and one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). *Id.* After this court recommended denying Rodriguez-Cumba's previous motion to suppress evidence obtained from a search of his vehicle and cell phone, Dkt. 218, he moved to suppress evidence obtained from the purportedly unlawful search of a residence and requested a *Franks* hearing. Dkt. 240. The government opposed. Dkt. 245. Rodriguez-Cumba's motion was referred to me for report and recommendation. Dkt. 241. For the following reasons, I recommend that his motion to suppress evidence and for a *Franks* hearing be **DENIED.**

### BACKGROUND

I included a complete summary of the surveillance and the suppression hearing testimony in my previous report and recommendation and familiarity with those facts is assumed. *See* Dkt. 218. For clarity, I briefly review the facts relevant here.

### *The Surveillance*

On September 9, 2021, Homeland Security Investigations ("HSI") Agent Juan Carlos Miranda ("Agent Miranda") took charge of surveilling Barbara Valentin-Rivera and the house at 48 Llamarada in connection with a drug trafficking investigation. Dkt. 186 at 59:3–7; 59:12–60:2; 133:21–134:1. On September 10, he directed two Puerto Rico Police Department ("PRPD") Task Force Officers ("TFOs") to surveil 48 Llamarada. *Id.* at 61:19–21.

That morning, the surveillance team saw a white Toyota pickup truck registered to Rodriguez-Cumba parked inside the structure's carport. *Id.* at 62:11–24. Rodriguez-Cumba left the house in this vehicle around 7:50 a.m. and returned in a black Dodge pickup truck around 10:00 a.m. *Id.* at 66:1–13. Shortly before noon, a Ford F-150 and a Toyota Highlander arrived, the drivers exited their respective vehicles, and each greeted Rodriguez-Cumba. *Id.* at 69:14–70:2. The drivers then retrieved a black box with a yellow lid from the black Dodge pickup and walked toward the residence. *Id.* at 69:21–25. The surveillance team relayed its observations to Agent Miranda who, based on his training and experience, believed they were consistent with drug or firearm trafficking activities. *Id.* at 70:11–14.

Sometime between noon and 1:00 p.m., a black Honda pilot arrived. *Id.* at 74:6–10. Agents would later identify its driver as Angel L. Jimenez-Cubero. *Id.* Around 1:00 p.m., multiple vehicles left the house. *Id.* at 78:18–24. A white Dodge Ram TRX then arrived, people moved four handbags from a Toyota Rav-4 parked at the residence into the Dodge Ram TRX, and the latter vehicle left around 1:15 p.m. *Id.* at 79:1–16; 80:12–23.

Agent Erionexis Vives Rosa ("Agent Vives") assisted with this investigation by parking his patrol car near Km. 180.3 of PR Road No. 2 to await further instructions. Dkt. 186 at 8:9–9:2, 11:12–24. Between 1:15 p.m. and 1:20 p.m., a man identified as TFO Velazquez called Agent

Vives and informed him that Rodriguez-Cumba had left 48 Llamarada in a Dodge Ram TRX. Dkt. 153 at 17:7–21 Agent Vives saw the vehicle pass him on PR 2 heading from Isabela towards Arecibo and began following it. *Id.* at 17:20–23. After witnessing Rodriguez-Cumba commit various traffic violations, Agent Vives pulled him over. *Id.* at 18:8–21.

While Agent Vives issued citations, TFO Velazquez and Agent Miranda arrived. Dkt. 153 at 24:17–23. After Agent Vives completed his task, Agent Miranda requested that a canine search the Dodge Ram TRX and the canine alerted to narcotic odor at the front right passenger side of the truck. *Id.* at 25:19–26:16. However, I previously found this alert unreliable and insufficient to search the vehicle. Dkt. 218 at 18–22.

Officers observed Rodriguez-Cumba using his cell phone during the traffic stop. Dkt. 186 at 90:25–91:1. Sometime later, Agent Miranda's supervisor told him the black Honda Pilot had returned to 48 Llamarada and its driver had retrieved packages from the residence, placed them in the vehicle, and driven away. *Id.* at 90–91:25–22. Agent Miranda then asked Ivan de Luis Miranda, Rodriguez-Cumba's attorney, for his client's consent to search the Dodge Ram TRX, *Id.* at 92–93:19–14, and both men refused. *Id.* at 93:10. Agent Miranda responded that he would call a tow truck to move the vehicle so he could continue the investigation elsewhere. *Id.* at 93:12–15. When Agent Miranda told Rodriguez-Cumba and his companion they could retrieve their personal belongings from the vehicle before it was towed, Rodriguez-Cumba grabbed a cross-body bag and a large sum of United States currency secured by rubber bands. *Id.* at 94:15–24. Agent Miranda told Rodriguez-Cumba to leave the currency in the vehicle and Rodriguez-Cumba complied. *Id.* at 94:20–95:1. Rodriguez-Cumba later consented to a search of the Dodge Ram TRX during which agents seized $24,620 in United States currency and several items of jewelry. *Id.* at 101:4–17; Dkt. 196-1 at 39–44.

### *The Affidavit*

On the night of September 10, HSI Special Agent Rolando Rojas ("Special Agent Rojas") sought and obtained a search warrant for 48 Llamarada. Dkt. 245-3. The warrant application states that multiple individuals repeatedly entered and left 48 Llamarada earlier that morning. *Id.* ¶ 5. It says Rodriguez-Cumba provided packages to a vehicle parked outside the residence and then went inside the house with two other people. *Id.* It then notes a Honda Pilot registered to Angel L. Jimenez-Cubero arrived. *Id.* ¶ 6. It says Rodriguez-Cumba left 48 Llamarada with another man in a Dodge Ram TRX around 1:00 p.m. *Id.* ¶ 7. It says the Honda Pilot then left the area. *Id.* The affidavit states PRPD agents stopped Rodriguez-Cumba in the Dodge Ram TRX around 1:30 p.m. and seized approximately $25,000 in United States Currency. *Id.* ¶ 8. It notes that police saw Rodriguez-Cumba use his phone during this stop. *Id.*

The affidavit states police at 48 Llamarada watched Jimenez-Cubero return in the Honda Pilot around 2:30 p.m., run frantically and repeatedly into the residence, and remove what appeared to be dark plastic bags, cardboard boxes, and other nondescript bags. *Id.* ¶ 9. It says Jimenez-Cubero immediately placed these items in the Honda Pilot. *Id.* Then, it says he drove off in that vehicle before agents suddenly observed him running away while looking to see if he was being followed. *Id.* ¶ 10. The affidavit states police found the Honda Pilot and that a canine sniffed it and alerted to the odor of narcotics. *Id.* ¶ 11. It notes police then obtained and executed a search warrant for the vehicle in which they found the bags and boxes they previously saw Jimenez-Cubero remove from 48 Llamarada. *Id.* ¶ 12. Inside those containers, it says they discovered sixty-two brick-shaped objects that tested positive for cocaine and smaller bags filled with what they believed was marijuana based on its odor, consistency, and their experience. *Id.*

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In general, "[a] nonconsensual search or seizure is unreasonable in the absence of a judicial warrant issued upon probable cause." *Ahern v. O'Donnell*, 109 F.3d 809, 816 (1st Cir. 1997). Though police here obtained a warrant to search 48 Llamarada, Dkt. 245-3, Rodriguez-Cumba alleges the affidavit underlying the warrant is rife with false statements rendering it invalid. Dkt. 240.

While search warrant affidavits are presumed to be valid, the Fourth Amendment permits a defendant to challenge the veracity of a warrant affidavit through a hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–156 (1978). To receive a *Franks* hearing, the defendant must satisfy two requirements. First, he must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56. The allegations of falsehood must be "more than conclusory" and must be accompanied by an "offer of proof." *Id.* at 171. A defendant should "point out specifically the portion of the warrant affidavit that is claimed to be false." *Id.* at 171. Technically accurate statements may also be impugned if they have been "rendered misleading by material omissions." *United States v. Grant*, 218 F.3d 72, 77 (1st Cir. 2000) (quoting *United States v. Scalia*, 993 F.2d 984, 986 (1st Cir. 1993)).

Second, the allegedly false statement must be necessary to a finding of probable cause. *See United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012). A *Franks* hearing is not required if, after the allegedly false material is set aside, "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 171–72.

Rodriguez-Cumba asserts Special Agent Rojas materially misrepresented and omitted facts in his search warrant affidavit for the residence at 48 Llamarada. Dkt. 240. Accordingly, he requests a *Franks* hearing and, ultimately, suppression of the warrant and all evidence obtained as a result. *Id.* The government argues Rodriguez-Cumba's motion should be denied because it fails to comply with this court's Local Rules, Rodriguez-Cumba lacks standing in the residence, and the search warrant application was supported by probable cause. Dkt. 245. I assume without deciding that Rodriguez-Cumba prevails on the government's first two arguments. Nevertheless, I recommend finding the search warrant was supported by probable cause regardless of the supposed misrepresentations he identified.

## I. Special Agent Rojas's Statements

Seizing findings in my previous report and recommendation, Rodriguez-Cumba argues Special Agent Rojas made material misrepresentations about the surveillance team's location, his delivery of a package, Jimenez-Cubero's movements, items found in the Honda Pilot, and the canine sniff of the Dodge Ram TRX. Dkt. 240 at 4–6. I address these statements below.

### A. Location of the Agents

Rodriguez-Cumba first notes that the affidavit contains photos taken directly across the street from the residence, in which the carport and walkway leading to the front door can be seen. Dkt. 240 at 4. He argues the photos inaccurately imply this was the surveillance team's vantage point. *Id.* I heard testimony addressing the surveillance team's location at the previously mentioned suppression hearing. There, Agent Miranda testified the surveillance team positioned itself several houses away from 48 Llamarada at the end of the street. Dkt. 186 at 118:1–10; *see also* Dkt. 197-1 at 5. Rodriguez-Cumba then presented expert testimony from Enrique Figueroa-Santiago that the agents' location was 355 feet from the residence and that a person in their position could only

see the sidewalk in front of the house, the hill leading to the carport, and a whether a person entered the carport area adjacent to the house. Dkt. 202 at 30:1–6; 30:19–31:6; *see also* Dkt. 197-1 at 5. On cross examination, Figueroa-Santiago conceded that agents could have also discerned the gender of a person walking between a vehicle and the house and seen if they were carrying a square two-by-two-foot box. Dkt. 202 at 46:22–47:23. Accordingly, I will assume the photo in Special Agent Rojas's affidavit was misleading, but that agents could still see the activity that Figueroa-Santiago outlined.

### B. Rodriguez-Cumba's Package Delivery

Rodriguez-Cumba next disputes that agents saw him provide packages to a vehicle parked outside 48 Llamarada. Dkt. 240 at 4. He argues that, because of their location, it was "physically impossible" for the surveillance team to see this activity. *Id.* After the suppression hearing, I observed the following:

> [E]ven if agents could not see the doorway of 48 Llamarada, they could have seen the seven cars that approached the residence. With the binoculars Agent Miranda testified are commonly used in such surveillance operations, they could have seen and identified Barbara Valentin-Rivera and Rodriguez-Cumba. Even if they could not have identified Rodriguez-Cumba from a distance, they could have logically concluded that the man they saw enter the Dodge Ram TRX around 1:15pm is the same man Agent Vives pulled over in the vehicle minutes later.

Dkt. 218 at 16–17. Thus, Rodriguez-Cumba's own expert and Agent Miranda contradicted Rodriguez-Cumba's assertion that it was "physically impossible" for the surveillance agents to observe him bringing packages to a vehicle outside 48 Llamarada.

Notably, even Rodriguez-Cumba immediately retreats from this contention. In the next sentence he states, "[t]he only way this would be possible was if Rodriguez-Cumba walked into the few feet of space visible for the surveillance team." Dkt. 240 at 4. That someone inside a residence would walk toward a vehicle parked outside while carrying a package hardly seems

extraordinary. And it is certainly possible that agents surveilling the residence with binoculars would see such activity. Without any other evidence, Rodriguez-Cumba has at best "set up a swearing contest" between himself and Special Agent Rojas, which does not entitle him to a *Franks* hearing. *United States* v. *Southard*, 700 F.2d 1, 10 (1st Cir. 1983). Arguably, he has not even done that because, as the government notes, he did not submit an affidavit with his motion. Dkt. 245 at 20. Either way, his showing is insufficient. Further, I have already heard Agent Miranda testify on this matter. Moreover, for reasons discussed below, this package delivery is unnecessary to a finding of probable cause and thus does not warrant a *Franks* hearing. *Rigaud*, 684 F.3d at 173.

### C. Jimenez-Cubero's Movements

Rodriguez-Cumba next questions that agents saw Jimenez-Cubero enter the residence, frantically remove dark bags and cardboard boxes, and bring those items to his Honda Pilot. Dkt. 240 at 4–6. As discussed, Rodriguez-Cumba's own expert testified the surveillance team could discern the gender of a person walking between a vehicle and the house at 48 Llamarada and see whether they carried a two-feet-by-two-feet box. Thus, agents could observe Jimenez-Cubero enter either the carport or walkway to the residence's front door, walk away from those areas with dark colored plastic bags and cardboard boxes, and place those items in a Honda Pilot. Even if the agents could not discern the identity of Jimenez-Cubero, they could indisputably determine that a *someone* performed these activities. Accordingly, I will analyze whether probable cause existed assuming agents could not identify Jimenez-Cubero from their vantage point.

### D. Items Found in Honda Pilot

Rodriguez-Cumba does not contest the search of the Honda Pilot. However, he asserts the search warrant affidavit falsely states that "the bricks of cocaine and bags of marijuana [found

within that vehicle] are the same ones removed from [48 Llamarada]." Dkt. 240 at 6. He offers no additional analysis as to why this statement is false. The affidavit states in full that, "[t]he containers (dark colored plastic bags, cardboard boxes, and bags) where the bricks of cocaine and bags of marijuana were located are the same ones removed from [48 Llamarada]." Dkt. 245-3 at 7. Again, Rodriguez-Cumba's own expert testified agents could have spotted similar containers from their vantage point. Rodriguez-Cumba's bare assertion that the agents simply lied about recognizing these packages is merely conclusory and unaccompanied by an "offer of proof." *See Franks*, 438 U.S. at 171. Accordingly, it does not warrant a *Franks* hearing.

### E. The Canine Sniff

Rodriguez-Cumba observed that, though Special Agent Rojas stated a canine alerted to narcotic odor in Rodriguez-Cumba's Dodge Ram TRX, he failed to include video of the canine search. Dkt. 240 at 5. Based on that video, I found the canine sniff failed to establish probable cause needed to search the vehicle. Dkt. 218 at 18–22. Rodriguez-Cumba offers no analysis of whether Special Agent Rojas knowingly and intentionally, or with reckless disregard for the truth, stated that the canine alerted to narcotic odor. I will assume he did and analyze whether probable cause to search 48 Llamarada arose without the canine sniff of the Dodge Ram TRX.

I note that I found agents ultimately established probable cause to search the vehicle based on the totality of the circumstances. *Id.* at 22–23. Further, Rodriguez-Cumba consented to the search, *id.* at 23–25, as Special Agent Rojas stated in his affidavit. Dkt. 245-3 at 3. Special Agent Rojas then correctly wrote that agents seized approximately $25,000 from the vehicle. *Id.* I now examine whether Special Agent Rojas's search warrant affidavit established probable cause given my findings.

## II.     Probable Cause

A search warrant affidavit "must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). "A magistrate judge considering the 'nexus' element must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him,' there exists a 'fair probability' evidence will be found in the place to be searched." *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019) (citing *Feliz*, 182 F.3d at 86) (further citations omitted). A "nexus . . . need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].'" *Feliz*, 182 F.3d at 88 (alteration in original) (quoting *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979)).

To assess the sufficiency of a search warrant application, courts examine "whether the totality of the revealed circumstances makes out a showing of probable cause, even with false facts stripped away, inaccurate facts corrected, and omitted facts included." *United States v. Barbosa*, 896 F.3d 60, 69 (1st Cir. 2018). And to establish probable cause to search a defendant's residence for evidence of drug trafficking, agents must include "specific observations" such as the following:

> evidence that drug distribution "was being organized from [the defendant's] residence," *United States v. Keene*, 341 F.3d 78, 82 (1st Cir. 2003), that the defendant used his home as a communications hub for drug activity, *United States v. Rivera*, 825 F.3d 59, 64-65 (1st Cir. 2016), or that the defendant "move[d] back and forth from his residence in relation to drug transactions," [*United States v.*] *Ribeiro*, 397 F.3d 43, 51 [(1st Cir. 2005)].

*Roman*, 942 F.3d at 52. As stated, I assume agents posted at the end of the block could not identify the people they saw entering the carport or entryway of 48 Llamarada and that the canine did not

alert to narcotic odor on the Dodge Ram TRX. I also note that Rodriguez-Cumba argues agents could not determine whether the people they saw approaching 48 Llamarada went inside the residence. However, agents could infer that people seen walking toward a residence and staying more than a few minutes were invited inside. Further, they could assume that valuable contraband and obvious evidence of a crime would be hidden inside an enclosed building, not in the carport, adjacent fields, or some other exposed area. *See Feliz*, 182 F.3d at 88.

Given these considerations, Special Agent Rojas's affidavit establishes probable cause. Among other things, it states that Rodriguez-Cumba left 48 Llamarada in a Dodge Ram TRX and had approximately $25,000 in United States currency when police stopped him in that vehicle minutes later. Dkt. 245-3 ¶¶ 7–8. It says police noticed Rodriguez-Cumba use his phone during this encounter and, a short while later, agents at 48 Llamarada watched a man return in a Honda Pilot, run frantically into the residence, and remove what appeared to be dark plastic bags, cardboard boxes, and other nondescript bags. *Id.* ¶¶ 8–9. After police watched this man running away, they found the abandoned Honda Pilot and a canine alerted to narcotic odor. *Id.* ¶¶ 10–11. When they obtained warrant to search the Honda Pilot later that day, police found the same containers they saw the man remove from 48 Llamarada. *Id.* ¶ 12. Inside those containers, they discovered sixty-two brick-shaped objects that tested positive for cocaine and smaller bags filled with what they believed was marijuana based on its odor, consistency, and their experience. *Id.*

Based on these facts, police can be virtually certain Rodriguez-Cumba left the residence with $25,000 of United States currency and that another man hurriedly left in Jimenez-Cubero's Honda Pilot with substantial quantities of controlled substances obtained from the residence. This kind of police surveillance, combined with an officer's general knowledge of the illicit drug trade, provides a sufficient basis for probable cause to issue a search warrant. *See Ribeiro*, 397 F.3d at

52 (probable cause where police observed [defendant] on several occasions when it was virtually certain that he left his residence carrying the ecstasy tablets that he would sell to an undercover officer).

Further, when a car seen parked at a residence is later found with evidence of drug trafficking inside, that fact "supports an inference of nexus" with the residence. *Roman*, 942 F.3d at 51. *Roman* is illustrative. There, the First Circuit found no nexus with a defendant's home after the affidavit established the defendant parked his car at a local tire shop, carried a "weighted bag" inside, and left a few minutes later. *Roman*, 942 F.3d at 47. The affidavit also stated the defendant had been seen driving a blue Acura SUV registered to his presumed wife and that agents had seen that vehicle at the defendant's home numerous times. *Id.* The *Roman* court found no nexus with the defendant's residence because the affidavit (1) failed to establish the vehicle from which the defendant emerged with the weighted bag was the blue Acura SUV seen at his residence; (2) never suggested the weighted bag contained drugs or paraphernalia; and (3) did not allege the defendant drove his vehicle to the residence on the day he was seen with the weighted bag. *Id.* at 51.

Here, by contrast, there are no such shortcomings. Special Agent Rojas's affidavit establishes that a man left 48 Llamarada in a white Dodge Ram TRX and Rodriguez-Cumba was stopped in that vehicle minutes later carrying $25,000 in United States currency. It further established that Jimenez-Cubero's Honda Pilot was seen leaving 48 Llamarada after someone hurriedly threw several bags and boxes inside. Then, it established that those boxes contained sixty-two bricks of cocaine and numerous baggies of what they believed to be marijuana. Likewise, it established both vehicles visited the residence at the same time on the day contraband was found within them. Thus, there was probable cause to believe Special Agent Rojas would find additional evidence indicative of drug trafficking inside 48 Llamarada.

## CONCLUSION

For the foregoing reasons, I recommend Rodriguez-Cumba's motion to suppress evidence obtained from agents' search of the residence at 48 Llamarada and his motion for a *Franks* hearing be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 7th day of July, 2023.

*s/ Bruce J. McGiverin*
Bruce J. McGiverin
United States Magistrate Judge